FITZGERALD *v.* UNION & PLANTERS' BANK & TRUST CO.[*]

(Division A.    Feb. 25, 1929.)

[121 So. 148.    No. 27058.]

*Corpus Juris-Cyc References: Bills and Notes, 8CJ, section 347, p. 212, n. 7; section 1362, p. 1053, n. 57.

*Maynard, Fitzgerald & Venable* and *Green, Green & Potter,* for appellant.

*Brewer & Brewer, Holmes, Canale, Loch & Glankler* and *H. E. Little,* for appellee.

Argued orally by *Gerald Fitzgerald* and *Marcellus Green,* for appellant, and *J. Elmore Holmes,* for appellee.

McGOWEN, J. On November 25, 1925, Gerald Fitzgerald, appellant here, filed his bill in the chancery court of Coahoma county against the Union & Planters' Bank & Trust Company, a corporation domiciled at Memphis, in the state of Tennessee, joining as defendants thereto

a number of resident corporations and individuals. Appellant, in his bill, seeks to recover certain moneys collected by the appellee bank in May, 1922, as the proceeds of a sale of collateral belonging to the appellant, but held by the appellee, and applied to the payment and extinguishment of what purported to be his entire indebtedness to the bank at that time.

Appellant's note held by appellee was for twenty-eight thousand six hundred seventy dollars and sixteen cents, dated March 13, 1922, due sixty days from date. The collateral securing the same was one hundred eighty shares of Delta Bank & Trust Company stock, five hundred eighty shares of Texas Oil Company stock, and a note secured by the trust deed signed by Daisy S. Rainer and others. Appellant's note was canceled on May 8, 1922. A small balance was left thereon, which, with a statement of the sale of the stock and the application of the proceeds, was mailed by the appellee to the appellant.

The bill further discloses that Fitzgerald admitted owing the bank a personal note of nineteen thousand one hundred fifty-four dollars and eighty-eight cents, and had before October 24, 1921, executed his note for eleven thousand six hundred sixty-eight dollars and eighty-one cents, which we shall refer to hereafter, for convenience, as the "trustee" note. On October 24, 1921, the amounts of these two notes were consolidated, the appellant, Fitzgerald, executing his note for twenty-eight thousand nine hundred thirty-six dollars and forty-four cents, the amount of balance due on the two notes, and stipulating that it should be secured by the collateral which we have heretofore described.

The gist of this proceeding is to recover the principal sum of eleven thousand six hundred sixty-eight dollars and eighty-one cents, with interest, and a denial that said note represented an indebtedness on the part of the

appellant, Fitzgerald, to the appellee bank—the note having originally been executed by the trustees, McWilliams and Lamkin, and renewed individually—the appellant contending that there was never any consideration for the original note and renewals nor for his note therefor and renewals and that it was agreed by and between the signers of the original note and Robert S. Polk, vice president of the appellee bank, that the note was not to be paid by the individuals signing it, but that the appellee bank should look to the collateral and not to the signers of the note for the payment of same.

The bill also charged that in the renewal of the note appellant was under duress imposed upon him by Polk, in that Polk threatened to withdraw from a creditors' agreement, which was an agreement to extend the collection of collaterals held by the appellee bank and several other banks for the indebtedness of the Delta Bank & Trust Company, which had closed its doors, and in which the appellant and his friends were largely interested; that the collateral involved amounted to more than a million dollars, and that the failure to carry out such agreement would entail financial ruin upon him, his friends, and associates connected and doing business with the defunct bank; and under coercion of this character he signed the renewal of the note.

The bill further alleged that the appellant, Fitzgerald, should have had a credit on his note for ten thousand six hundred dollars, the purchase price of fifty shares of stock ostensibly sold to one Wylie, who really in fact bought such for Polk, and that the purchase thereof was withheld from Fitzgerald for more than a year. This stock was a part of the original collateral securing the "trustee" note. The bill prayed for a recovery of the principal sum of the "trustee" note and that writs of attachment issue as to the resident defendants, requiring them to answer as to the amounts of the indebtedness due by them to the nonresident bank, the appellee.

We have not undertaken to set out the many pages of pleading which appear in this record, but content ourselves with stating the issue raised. The answer of the appellee bank put in issue all the material allegations of the bill. At the conclusion of the evidence, the chancellor dictated the following opinion:

"By the Court: Mr. Stenographer, please take this finding of fact and copy it as a part of the record in the case.

"After resolving in favor of the complainant the oral evidence given by the witnesses in open court and by deposition as to what was said at the several conferences and in the several conversations testified about, and after resolving in favor of the complainant the other oral proof except where contradicted by letters and other written evidence, the court is of the opinion that all notes executed by the complainant to the Union & Planters' Bank & Trust Company after the execution of the creditors' agreement of the Delta Bank & Trust Company were voluntarily executed under conditions not constituting duress or coercion, whether the complainant was influenced by statements of Mr. Polk or not, and the court is of the opinion that the complainant has not established a right of recovery as against the defendant, Union & Planters' Bank & Trust Company, of Memphis, Tennessee, or as against any of the other defendants named in the bill, and that the decree should be in favor of the defendants."

The final decree of the chancellor recited that the case was heard on bill, answer and amendments, etc., as follows:

"The court is of the opinion that the complainant has failed to sustain the allegations of his bill and that he is not entitled to the relief prayed for, or to any relief at all, and being of the opinion that said bill of complaint, with the amendments thereto should be dismissed at the cost of the complainant.

"It is therefore, accordingly, by the court ordered, adjudged, and decreed that the bill of complaint filed herein and all amendments thereto be, and the same are hereby, finally dismissed on their merits, at the cost of the complainant."

We do not deem it wise to undertake to detail all of the evidence appearing in this record, nor even a synopsis of the same, but shall content ourselves with a brief statement of the issue involved, the documentary evidence and letters, and of the oral proof offered by the complainant by which he sought to overcome all of the written documents and letters in this case.

Early in the year 1919, in pursuance of a conversation had between G. T. Fitz Hugh, an attorney and director of the appellee bank, on the one hand, and Fitzgerald, on the other hand, a meeting of certain gentlemen was held in the office of the Union & Planters' Bank & Trust Company, where it is certain that J. O. Lamkin, cashier, Fitzgerald, director, and McWilliams, director, all being officers of the Delta Bank & Trust Company of Clarksdale, were present. R. S. Polk, the vice president of the appellee bank, Fitz Hugh, an attorney, Hill, and perhaps Bragg and Winston, were also present. The latter were residents of Memphis, Tennessee, and were all stockholders connected with the Union & Planters' Bank & Trust Company, the appellee. It was represented that the appellee bank desired a close connection with the Delta Bank & Trust Company at Clarksdale, and that the Clarksdale Bank desired this connection in order to handle the large loans upon real estate then prevalent in the Delta section of this state; and, as a result of this conference, a written agreement was entered into. We quote *verbatim* the opening part of this agreement, and digest the remainder of it, the beginning of which is as follows:

"This agreement made and entered into on this the 19th day of February, 1919, by and between R. N. Mc-

Williams, President of the Delta Bank & Trust Company of Clarksdale, Mississippi, and Gerald Fitzgerald, Vice-President of the said Bank, and J. O. Lamkin, Cashier of said Bank, parties of the first part; and G. T. Fitz Hugh and his associates, parties of the second part, witnesseth that:

"Whereas, the parties hereto are desirous of forming a banking connection suitable and convenient for the carrying on of business between their several interests:

"Now therefore, it is agreed by and between the parties hereto."

Fitzgerald and his associates would call a meeting of the stockholders of the Delta Bank & Trust Company for the purpose of issuing an increase of five hundred shares of stock of said bank of the par value of one hundred dollars and amending the charter thereof, and would endeavor to have the stockholders vote for the issuance of such stock for the purpose of carrying out the agreement.

Fitz Hugh and his Memphis associates agreed to absorb three hundred fifty shares of such stock at the par value of one hundred sixty-five dollars. The remaining one hundred fifty shares of the stock were not absorbed. In this agreement it was provided that McWilliams and Lamkin, representing the board of directors of the Delta Bank & Trust Company, and R. S. Polk and G. T. Fitz Hugh, representing the parties of the second part, shall, as a committee appointed by the board, dispose of the balance of the one hundred fifty shares of stock of the Delta Bank & Trust Company, such stock to be disposed of to different parties and at such price as may be chosen and designated by said committee.

It was also agreed that the charter would be amended and that the stockholders of said bank would be importuned to waive their right to subscribe for any part of this new issue of stock. It was further agreed that Fitzgerald and his associates would elect a person as director

of the Clarksdale Bank, to be chosen by Fitz Hugh and his associates, and that T. B. Ricks would be elected cashier for one year at a salary of four thousand two hundred dollars and J. O. Lamkin, as vice president. The consideration recited was the advantages to accrue to the parties concerned and one dollar cash in hand paid. It was agreed that the stock should be legally issued and delivered to Fitz Hugh and his associates in the amount of three hundred fifty shares, as they might direct; the agreement being signed by R. N. McWilliams, J. O. Lamkin, Gerald Fitzgerald, and G. T. Fitz Hugh.

The charter was amended, the stock issued and mailed to R. S. Polk, vice president of the appellee bank on April 12, 1919, who, in the meantime, had furnished the names of the persons to whom the stock was to be issued and the amount, to make up the three hundred fifty shares. The certificate of one hundred fifteen shares was issued to J. O. Lamkin. The certificates of stock were mailed to Polk with the request that collection be made from the various subscribers and credited to the bank at Clarksdale. With the stock was sent a note for nineteen thousand two hundred sixty-three dollars and forty-nine cents, dated April 19, 1919, payable to the appellee bank, bearing interest at the rate of six per cent., and providing for attorney's fees; the one hundred fifteen shares of stock being attached thereto and pledged as collateral for the payment of the note. This note was signed by R. N. McWilliams and J. O. Lamkin, as trustees. On April 14, 1919, Polk, vice president and cashier of the appellee bank, wrote Lamkin, vice president and cashier of the Delta Bank & Trust Company, advising him of a total credit of eighty-two thousand five hundred dollars, consisting of eighteen thousand nine hundred seventy-five dollars as proceeds of the above note, and sixty-three thousand five hundred twenty-five dollars, collections for the three hundred shares of stock. On July

10th, Lamkin wrote Polk acknowledging receipt of notice of the maturity of the note above described, as follows:

"We wish to ask that you renew this note for ninety days and enclose herewith renewal note signed by Mr. McWilliams and the writer, as trustees.

"We have added to this renewal note two hundred eighty-eight dollars and ninety-seven cents interest for ninety days and three dollars and ninety-two cents for revenue stamps.

"We trust before the expiration of this note, to dispose of the stock attached to it and have the matter satisfactorily closed."

On the 11th of July, Armistead, assistant cashier of the appellee bank, wrote Lamkin, calling attention to the maturity of the note, and submitted two notes in renewal, one due sixty days from date and the other due six months, giving him the privilege of renewing same by signing either of the notes inclosed, and used this language:

"We would appreciate your signing individually and not as trustees, as the State Bank Examiner on his regular examination invariably makes exception of any notes signed by trustees and on his last examination made special report on this particular item."

On or about December 11, 1919, Lamkin having severed his connection with the Delta Bank & Trust Company, Armistead, the assistant cashier of the appellee bank, wrote the Delta Bank & Trust Company, requesting that the certificate of stock securing the said note be transferred to the name of Gerald Fitzgerald, properly signed and witnessed, and returned to the appellee bank, and used this language:

"Mr. Lamkin will of course understand that he will not be held in any way liable for any indebtedness that may be secured by this stock."

On December 13th, responding thereto, Lamkin returned the new certificate of stock issued in the name of Gerald Fitzgerald, and said:

"This, of course, is with the condition, as stated in your letter, that I will not be liable in any way for any indebtedness that may be secured by this stock.

"This transfer is made because of the fact, as you say in your letter, that I have tendered my resignation to the Delta Bank & Trust Company and can no longer serve as Trustee for the holding of this stock."

On December 15, 1919, receipt of the certificate in the name of Gerald Fitzgerald was acknowledged by the appellee bank. On January 6, 1920, Lamkin inclosed in a letter to the appellee bank dividend check for one thousand one hundred fifty dollars, payable to it, which was for dividend, as stated in the letter, on the one hundred fifteen shares of stock, collateral on the note signed by Fitzgerald and McWilliams as trustees, and asked that the dividend be credited on the note. On January 8, 1920, Polk wrote Fitzgerald that he was sending him certificate No. 215 for the one hundred fifteen shares of stock in his favor in lieu of which certificates for thirty, fifty, and thirty-five shares were to be issued to S. S. Harris, W. B. Wylie, and himself, respectively. On January 19, 1920, the Delta Bank & Trust Company sent to the appellee exchange for seven thousand five hundred twenty-four dollars to cover thirty shares of stock held by Mr. Harris and five shares of stock retained by Mr. Fitzgerald for Mr. E. J. Mullins.

On January 20th, after this credit had been made on the original note, Polk, vice president of the appellee bank, wrote Fitzgerald, inclosing a six months' note for eleven thousand six hundred sixty-eight dollars and eighty-one cents, secured by eighty shares of the Delta Bank & Trust Company stock, together with a statement of the credits which had been applied to the original note, requesting him to sign and return the note, to which Mr.

Fitzgerald replied on January 21, 1920, addressing his letter to R. S. Polk, vice president of the Union & Planters' Bank & Trust Company, thus:

"Dear Bob: I am herewith inclosing note for eleven thousand six hundred sixty-eight dollars and eighty-one cents for the shares Delta Bank & Trust Company stock. With regards, etc.,

"Your friend,    GERALD FITZGERALD."

On April 1, 1921, Fitzgerald wrote the appellee bank regarding the collateral for his individual note, and wanted it to draw on him for the amount of this note, to which Armistead, the cashier of appellee bank, replied:

"Replying to yours of April 1st we wish to advise that we hold your two notes due on April 27th;

"One for eleven thousand six hundred sixty-eight dollars and eighty-one cents.

"One for eighteen thousand five hundred fifty-four dollars and eighty-eight cents.

"When these notes are paid, we will surrender all of your collateral.

"Yours very truly,

"E. A. ARMISTEAD, Cashier."

On April 20, 1921, Fitzgerald wrote the appellee bank a letter in which this language was used:

"The other note of eighteen thousand five hundred fifty-four dollars and eighty-eight cents I do not know about, unless it has reference to a trustee account for the holding of certain stock of the Delta Bank & Trust Company by your Mr. Polk, myself, and others, but I cannot believe that the Bank is attempting to hold me personally *for the entire amount* (italics ours) of this trustee indebtedness."

The Delta Bank & Trust Company failed on the 15th day of March, 1921. On April 23, 1921, the appellee bank wrote Fitzgerald a letter in which it said: "We look to you for payment of both the notes which were prop-

erly executed by you and discounted by us in due course of business.''

On April 27, 1921, after this correspondence, Fitzgerald executed the consolidated note for the sum total of his personal, as well as the ''trustee'' note. At this time Fitzgerald testified that he had a conversation with Polk in which Polk told him that the appellee bank would look to the collateral for the payment of the note, so that, at the time of the execution of this note, Fitzgerald was aware of the situation. On April 28, 1921, Fitzgerald wrote Frank F. Hill, G. T. Fitz Hugh, R. S. Polk, Gilmer Winston, Frank Bragg, all residing in Memphis, Tennessee, and R. N. McWilliams, of Clarksdale, a letter in which he recited the events which lead to the issuance of this stock, stating to each of them:

''Now, as you gentlemen know, it would be unfair to me and not according to my agreement for me to have to pay this entire note when the stock did not belong to me nor could I have procured it if I had wished. I am therefore writing to the Union & Planters Bank & Trust Company at Memphis, sending them a copy of this letter, telling them to please give me a statement of this particular item from the time it was entered on July 11, 1919, down to this date. *And whatever balance may be due them together with interest from the time I took over should and ought to be divided among us equally so that the whole amount will not fall upon any one of the committee.''* (Italics ours.)

The Memphis gentlemen responded by denying liability on the note.

On May 23, 1922, Fitzgerald wrote the appellee bank that the settlement it had made in the application of the proceeds of his oil stock was not satisfactory, and that he was not responsible to the bank for the Delta Bank & Trust Company stock which was held by him in trust, and ''for which you advanced the money to the members of the Committee appointed on behalf of your Bank and

the Delta Bank and Trust Company to hold this stock in trust." He complains next of the difference in its attitude to Lamkin and himself, in that *the appellee bank* released Lamkin of all responsibility although he was the man to whom it had loaned the money for the purchase of this stock for the committee.

On December 5, 1924, Fitzgerald wrote to Fitz Hugh, inclosing documents in connection with this transaction, and said in the discussion of the history of this transaction, "I was simply taking the place of the two of the committee, R. N. McWilliams and J. O. Lamkin," and stated that the bank required him to pay the entire note with interest, using this significant language: "Which, of course, was not due and owing by me alone, but which was a debt each one of the pool, composed of yourself, R. S. Polk, Mr. Frank Hill, Mr. Frank Bragg, myself, and R. N. McWilliams was individually liable for his particular part." He also contended in this letter that Polk, who had died since the transaction took place, owed one-sixth of the amount which the appellee bank had collected from him.

Fitz Hugh replied on January 9, 1925, in which letter he took issue with Fitzgerald and denied liability. On January 13, 1925, Fitzgerald wrote Fitz Hugh, still contending that the members of the "pool" were individually liable to him for their share of the stock, and informed him that he was instructing his attorneys to proceed against the Memphis members. On February 6, 1925, Fitzgerald again wrote Fitz Hugh offering to arbitrate the matter with him.

We think it proper here to give a concise statement of the notes and renewals in order that this opinion may be understood. The original note, dated April 12, 1919, signed by R. N. McWilliams and J. O. Lamkin, as trustees, was executed, and renewed later on July 11, 1919, by Lamkin and McWilliams individually. On January 20, 1920, the balance due on the note was renewed by

Fitzgerald, eighty shares of the Delta Bank & Trust Company being attached thereto as collateral. Again on July 21, 1921, it was renewed, and on October 19, 1920, January 27, 1921, and July 28, 1921. On October 24, 1921, the note was renewed by the consolidated note for twenty-eight thousand nine hundred thirty-six dollars and forty-four cents, which was again renewed on December 23, 1921. The last renewal was on March 13, 1922.

The several briefs filed by the different counsel for appellant are all based upon the assertion that the chancellor found the facts in his favor. It will be observed that there is no finding of fact in the decree dismissing this bill. The terse statement of the decree is that complainant is not entitled to recover.

We must assume that, if legal reason exists for the maintenance of this decree, the chancellor adopted it, and that same is embraced within the terms of the decree; but, if we are not correct about this and must resort to the oral opinion of the chancellor, we unhesitatingly say that counsel are mistaken in their construction of this opinion. The chancellor simply announced that, if he resolved all the oral evidence in favor of Fitzgerald, with the exception of where it was contradicted by letters and other written evidence, the appellant, Fitzgerald, was bound by his renewal of the notes. And this opinion of the chancellor does not in any degree constitute a finding of fact in favor of the appellant, because the letters and documentary proof, the notes signed, and renewal thereof, overwhelm the testimony and theory of Lamkin, McWilliams, and Fitzgerald that an agreement was had with them by Polk, as a representative of the appellee bank, to look to the collateral alone for the payment of this money. It is a significant fact, and insuperable barrier to any recovery in this case by Fitzgerald, that he never once notified the bank that he counted upon an agreement with the bank to void the payment of this note, but the letters and notes in this

connection are incontrovertible evidence of the fact that Fitzgerald when dealing with the bank never made or intimated this claim to the bank. Neither did Lamkin nor McWilliams.

Assuming that the conversation as detailed took place between Polk and these parties, it is a significant fact that, before the consolidated note was signed, Fitzgerald never notified the bank that Polk, as its representative, had agreed that he (Fitzgerald) was not liable for the note, but that the bank was to look to the collateral. The appellee bank called upon Lamkin to have Fitzgerald assume the note, and upon his doing so it would release Lamkin. A like letter was written to Fitzgerald, in which it was stated that Lamkin would be released when he assumed the liability. This is notice to the appellant at the inception of his assumption of liability that the appellee bank was looking to the individuals signing the note. And the bank's position was not questioned—in other words, it was demanding individual security in addition to the collateral. In each of the letters, Fitzgerald's contention—written after the conversation with Polk, and testified to by him—was that he was simply a trustee and denied owing the note, but admitted personal liability as a member of the "pool." By "pool," we refer to the original parties to the agreement, the Memphis and Clarksdale parties.

It is too clear for argument that Fitzgerald did not regard Polk's conversation as emanating from the appellee bank but as coming from one of his associates in the business deal to protect Polk's interest adverse to the bank, because, if Fitzgerald could not be held, certainly Polk would be absolved from any liability in his negotiation of this deal with his Memphis and Clarksdale associates; their interest being identical at the time the conversation was had. So far as this record shows the appellee bank was never acquainted with the contention that its officer had made for it an agreement

virtually to purchase the one hundred fifteen shares of stock in another bank. The fact emphasized in the first meeting of these gentlemen in their discussion when making their business arrangements, apart from the interest of the appellee bank, was that the bank, under the law, was not permitted to purchase stock in another bank.

Lamkin's letters, which are quoted above, are inconsistent with this sworn testimony that the appellee bank looked to the collateral, because the bank as such never undertook to sell and deliver this stock. Fitzgerald, Lamkin, the Delta Bank & Trust Company, together with their Memphis associates in the "pool," sold the stock without regard to the desires of the appellee bank—in fact, this record shows that the appellee bank had no authority save that given by its contract in the note fixing a lien on the collateral, and the note was in every case renewed within a reasonable time after its maturity.

We have only this one question to decide, having reached the conclusion on the facts in this case with reference to the money paid to the appellee bank on Fitzgerald's note, that he did not meet the burden of proof imposed. And we say this even if the chancellor had distinctly found the facts in his favor. Such finding would be contrary to reason. The gentlemen composing this "pool" were not unlettered men or unfamiliar with business routine, but, on the contrary were shrewd sagacious bank officials and lawyers of recognized ability. Fitzgerald said in one of his letters, complaining to the appellee bank, "You advanced the money to the committee." This statement is the rationale of the facts of this case. By the signing and renewal of these notes, the appellee bank was induced to part with its money, and, by the signing of these notes and the receipt of this money by the Delta Bank & Trust Company for this stock, the "pool" was enabled to control and place the sale of the stock subject to the right of the appellee bank

to enforce its lien thereon in case of failure to pay the note secured thereby.

Lamkin and McWilliams were accommodation indorsers for this "pool," and they secured every benefit that was contemplated by the original agreement entered into by them when they formed it. Under our statute this constituted a good and valid consideration; and, when Fitzgerald voluntarily signed the first note in renewal of Lamkin's note, the original consideration, together with the favor of extension granted to them, constituted a good and valid consideration. Originally, under our statute, Lamkin and McWilliams were accommodation indorsers for the "pool," and subsequently, according to Fitzgerald's own letter, he took their places and became an accommodation indorser, controlling the disposition of the stock as substituted director of the committee to act for the "pool." Section 2783, Hemingway's 1927 Code, is as follows:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

This section is identical with section 3516a37, Shannon's Code of Tennessee 1917; both states having adopted what is generally known as the Negotiable Instruments Act. If there was a consideration for the note originally, that consideration continued until the date of its payment. The question, therefore, of duress does not enter into this lawsuit.

The only other point raised is that the appellee bank is liable for Polk's action in the admitted fraudulent sale to Wylie. As we have before stated, there is nothing to show that the appellee bank had any part in the sale of this collateral and in the transfers, but it is a sig-

nificant fact that, from the time Fitzgerald authorized Polk to sell the stock to Wylie and transfer it in the name of the latter, he continued to execute notes which stated on their faces that the same number of shares of stock were still with the bank as collateral with his note and his renewals thereof. Reference is made to the notes dated in the year 1920. It would be exceedingly strange that one would sign a note for more than eleven thousand dollars, payable to the bank, when, if the sale had been made to Wylie in good faith and so understood by the appellant, the amount would have been reduced to less than one thousand two hundred dollars. But this is the record evidence in this case. We mean to say that this was a transaction of the "pool" in which the bank was not concerned so long as it had sufficient individual and collateral security for its money. There is no merit in this contention, and the decree of the court below will not be disturbed in anywise.

The other questions raised by counsel not specifically referred to in this opinion have been pretermitted.

*Affirmed.*